## W. H. McCUNE, Appellant, v. W. R. HOUSTON and W. M. FIBLE, Respondents.

**Kansas City Court of Appeals, April 21, 1913.**

STOCK BROKERS: Damages: Trial: Instructions. Plaintiff owned 150 shares of stock in the possession of his broker to whom he owed a large sum for the purchase of the stock. He sued for damages for failure to obey an order to sell the stock. The order was in writing and directed the broker to sell 200 shares, or fifty more than plaintiff had, at $85 and to comply with said order the broker would have had to borrow fifty shares or advance funds to obtain same. This the broker was unwilling to do as he did not wish to increase the loan to plaintiff. In an attempt to show that such written order was an order to sell the 150 shares at $85, plaintiff attempted to prove a custom whereby the broker upon receipt of such an order would borrow the excess shares and execute the order, but made no showing that such custom applied where a state of facts existed as was shown to exist between these parties. *Held*, that even if it was permissible to prove such a custom under the pleadings which is not decided, an instruction submitting to the jury the question whether such written order was an order to sell 150 shares at $85, was erroneous in the absence of evidence showing the applicability of such custom to parties situated as these were.

Appeal from Jackson Circuit Court.—*Hon. Thomas J. Seehorn*, Judge.

AFFIRMED.

*Kimbrough Stone* and *Bowersock, Hall & Hook* for appellant.

*Lathrop, Morrow, Fox & Moore* for respondents.

TRIMBLE, J.—Defendants are stock brokers doing business in Kansas City. Plaintiff had placed orders with them for the purchase and sale of stocks prior to the time involved herein, and understood the course of dealing and the respective rights of each.

About August 6, 1907, he had become the owner of 150 shares of Amalgamated Copper Stock purchased for him by defendants. At this time and thereafter plaintiff owed them something over $10,000, a part of which was for the purchase price of the stock bought for him, and which stock defendants held as collateral security for plaintiff's indebtedness. On September 29, 1908, defendants notified plaintiff by letter that they were unwilling to extend or carry the loan any longer. October 3, 1908, plaintiff by letter ordered defendants to "kindly enter my open order to sell 200 Amal. copper at 85 and buy 100 at 75," and requested a reply by letter as he would be out of the city except on specified days of the week. On the same day plaintiff wrote defendants asking them to let his note run for a while as he would be in a better shape to meet it shortly. Defendants did not reply to the letter ordering a sale of 200 amalgamated copper at 85 but did answer the other letter saying his note was past due and that they had carried him through a bad market depression and that his account would exhaust at 72¾. That is, if the market price went down, the lowest price at which it could be sold and realize enough to pay plaintiff's indebtedness would be 72¾. They also notified plaintiff in said letter that they did not care to risk their capital to protect his account and that when the stock reached the above figure they would have to sell to pay his indebtedness. Plaintiff did nothing in regard to taking care of his indebtedness although repeatedly requested to do so. And on December 2, 1908, defendants wrote plaintiff, again assuring him they would not carry his 150 shares beyond the funds in hand and that they had placed a stop loss order on them at 73¼. This meant that if the market went to as low a figure they would be compelled to sell in order to protect themselves. Prior to this, amalgamated copper had been going up and on November 8, 1908, plaintiff wired defendants

to sell his 150 shares at 88.50 but the market never went that high. Again on January 2, 1909, plaintiff wrote not to sell the stock for less than 85⅜, but after this was written, the stock never reached this figure. When it began to decline defendants on January 30, 1909, sold the stock at 73⅜, the highest market rate obtainable, and applied the proceeds to the payment of plaintiff's indebtedness and remitted the balance to plaintiff. To this plaintiff replied February 8, 1909, saying he could not accept their action in selling his stock as final and that he was preparing to proceed against them based on their *promise of protection* and their failure to do so and their *failure to execute one of his selling orders.*

The suit is for damages sustained by reason of the failure of defendants to sell the stock at $85 as ordered by plaintiff. The petition alleges that the 150 shares of stock were in defendant's possession with instructions to sell same whenever plaintiff should order the same sold and that defendants agreed for a consideratiton to sell same. It further alleges that when said stock reached $85 plaintiff ordered them to sell it but defendants failed to do so, and afterwards without authority sold said stock at $73⅜. The damage asked is the difference between the amount which would be realized from a sale at $85 and that received from a sale at $73⅜.

The defense was that no order to sell the *150* shares at $85 was ever given. An order to sell *200* shares at $85 was given but this was fifty shares more than plaintiff had. There was some attempt to show that there was a custom by which, when an order was received to sell more than a customer had, the excess shares were in some way "borrowed" and the sale made according to the order. Whether evidence of this custom was admissible or not under the pleadings, there was no showing that such a custom applied to a situation here disclosed where the brokers were de-

clining to buy more for the customer and were urging the latter to take care of his indebtedness, and assuring him they could no longer carry the indebtedness but would have to sell if the stock reached a certain figure in its descent. This figure was on January 18, 1909, placed at 73⅜ good until the close of business January 30, 1909.

At the close of the testimony defendants demurred and this was overruled. But one instruction was given. That was in behalf of plaintiff and reads as follows:

"The court instructs the jury that if you believe from the greater weight of the credible testimony that the plaintiff was the owner of one hundred and fifty shares of Amalgamated Copper Stock in October, 1908, and the defendants were the agents for a consideration to sell same, then if you further find from the evidence that the plaintiff ordered the defendants in October, 1908, to sell the stock at $85 per share and if you further find that such order was to sell 150 shares of stock, and defendants failed to execute the same and could have executed the same at said price and afterwards defendants sold said stock in January, 1909, at 73⅜ per share without the waiver of the previous order on the part of the plaintiff and without the authority of the plaintiff, then your verdict will be for the plaintiff unless you believe from the greater weight of the credible testimony that the defendants offered the sum of $24.92 in full settlement of all claims and plaintiff accepted it as such and you may assess his damages at the difference between what the plaintiff would have received had the stock sold at $85 per share and what he did receive when it sold at $73⅜."

The jury returned a verdict for plaintiff and a motion for new trial was sustained because of error in giving said instruction. From this order plaintiff appeals.

The court did right in granting a new trial. It is not necessary for us to specify all the alleged errors that may have been committed in giving said instruction. If it contains one error that is sufficient to justify the court's action in granting a new trial.

To our minds the most apparent error is in submitting to the jury the question whether the order of October 3, 1908, was an order to sell 150 shares at $85 when the proof was that the order was to sell 200 shares at that figure or fifty more than plaintiff had and there was no proof that this was such an order as plaintiff had any right to make since it involved the necessity of defendants advancing more money to plaintiff, something they were repeatedly declining to do. As stated before, if there was a custom by which the extra fifty shares could be borrowed, and even if evidence of such custom was admissible under the pleadings as they stood, still there was no evidence tending to show that such custom was applicable to the state of facts existing between plaintiff and defendants. On the contrary, the inference is that plaintiff himself did not consider the custom applicable, nor that the order was one to sell his holdings at $85 since he made no complaint when notified that it was not executed and later ordered a sale of the precise number of shares owned by him at higher prices, which prices were never reached, and therefore his order could not be executed.

Defendants contend that inasmuch as plaintiff accepted and cashed a check for $24.92 sent him by defendants as the balance due on the account between them, therefore, all matters in dispute between the parties were settled and the court should have so declared. We think the question of whether there was a settlement made by the acceptance of this check might be a question for the jury to determine under appropriate instructions, since the check was not sent in

any way to indicate that it was offered in settlement of any damages accruing to plaintiff by reason of failure to obey an order to sell. The judgment of the trial court is affirmed and both sides are left free to proceed as to them may seem best. All concur.